IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
PINE BLUFF DIVISION

VINCENT HUSSEY                                                                                          PLAINTIFF
ADC #109212

V.                                            NO.  5:04CV00034 JWC

CHARLOTTE GREEN, et al                                                                       DEFENDANTS

MEMORANDUM OPINION AND ORDER

**I.  Background**

Plaintiff suffers from glaucoma and is exempt from all duties that require peripheral vision.  Plaintiff asserts that he was denied his chronic care medication (eye drops) between April 3, 2003, and July 3, 2003.  Even after he notified medical personnel and former Defendant Mobley of this denial through the grievance procedure, he was denied some of his medication again between October 13, 2003, and November 6, 2003.[1]  In addition, Plaintiff asserts that his tinted sunglasses were stolen in May 2003, and were not replaced until August 2003, and that he was wrongfully placed on field duty against medical restrictions.

On March 10, 2006, Defendants Simmons, Grandy, and Green filed a motion for summary judgment and brief in support (docket entries #98, #99) seeking to dismiss Plaintiff's 42 U.S.C. § 1983 complaint on the grounds that he has failed to establish a valid constitutional claim of deliberate medical indifference.  After requesting and receiving an extension (see docket entries #106, #107), Plaintiff's counsel has filed a response (docket entry #112).  On March 21, 2006, Defendants James and Evans also filed a motion for summary judgment and brief in support (docket entries #101, #102).  They seek to dismiss

---

[1] Apparently, Plaintiff's prescriptions should be refilled at two-week intervals (see docket entry #39).

Plaintiff's complaint on the grounds that he has failed to state a claim upon which relief can be granted, sovereign immunity, and qualified immunity. Plaintiff's counsel has also responded to this motion (docket entry #114). For the reasons that follow, Defendants' motions are granted and Plaintiff's claims against them are dismissed in their entirety with prejudice.

## II. Standard

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). The Court must view the evidence in the light most favorable to the nonmoving party, giving him the benefit of all reasonable factual inferences. Reed v. ULS Corp., 178 F.3d 988, 990 (8th Cir. 1999). A moving party is entitled to summary judgment if the nonmoving party has failed to make a sufficient showing on an essential element of his case with respect to which he will have the burden of proof at trial. Celotex, 477 U.S. at 322-23. To avoid summary judgment, the nonmovant must go beyond the pleadings and come forward with specific facts, "by [his] own affidavit" or otherwise, showing that a genuine, material issue for trial exists. Id. at 324; Fed. R. Civ. P. 56(e). A nonmovant has an obligation to present affirmative evidence to support his claims. Settle v. Ross, 992 F.2d 162, 163-64 (8th Cir. 1993). A litigant's verified complaint is generally considered an affidavit for purposes of summary judgment. Burgess v. Moore, 39 F.3d 216, 218 (8th Cir. 1994).

## III. Analysis

**A.     Defendants Simmons, Grandy, and Green**

As to Defendants Simmons, Grandy, and Green, Plaintiff has raised two claims: (1) he was denied his chronic care medication (eye drops) between April 3, 2003, and July 3, 2003, and again between October 13, 2003, and November 6, 2003; and (2) his tinted sunglasses were stolen in May 2003, and were not replaced until August 2003.

In support of their motion for summary judgment, Defendants contend that they have presented indisputable medical evidence that establishes: (1) Plaintiff did not suffer any harm from missing his glaucoma medication in 2003; and (2) Plaintiff neither needed, nor was he harmed by, going without tinted sunglasses.

To prevail on his claim of deliberate medical indifference, Plaintiff must allege acts or omissions by Defendants "sufficiently harmful to evidence deliberate indifference to [his] serious medical needs." Jolly v. Knudsen, 205 F.3d 1094, 1096 (8th Cir. 2000) (citing Estelle v. Gamble, 429 U.S. 97, 106 (1976)).  The Eighth Circuit has interpreted this standard to include both objective and subjective components: "The [plaintiff] must demonstrate (1) that [he] suffered [from] objectively serious medical needs and (2) that the prison officials actually knew of but deliberately disregarded those needs." Jolly, 205 F.3d at 1096 (citing Dulany v. Carnahan, 132 F.3d 1234, 1239 (8th Cir. 1997)); see also Stetter v. Riddick, 6 Fed. Appx. 522 (8th Cir. 2001) (unpub. per curiam) (citing Moore v. Jackson, 123 F.3d 1082, 1086 (8th Cir. 1997)).  This standard has been well settled for some time, and Plaintiff's burden is substantial.  In determining whether Defendants were deliberately indifferent to his serious medical needs, Plaintiff must demonstrate "more than negligence, more even than gross negligence." Estate of Rosenberg v. Crandell, 56 F.3d 35, 37 (8th

Cir. 1995). Moreover, "mere disagreement with treatment decisions does not rise to the level of a constitutional violation." Id.

First, Plaintiff must establish that he suffered from an objectively serious medical need. A medical need is "serious" if it has been diagnosed by a physician as mandating treatment or if it is so obvious that even a lay person would recognize the necessity for a physician's treatment. Coleman v. Rahija, 114 F.3d 778, 784 (8th Cir. 1997); see also Roberson v. Bradshaw, 198 F.3d 645, 648 (8th Cir. 1999). Clearly, Plaintiff suffered from an objectively serious medical need. It is undisputed that Plaintiff has been diagnosed with, and is receiving ongoing care for, glaucoma. Next, Plaintiff must establish that Defendants were (1) personally aware of his serious medical needs; and (2) deliberately disregarded those needs. Coleman, 114 F.3d at 785-86. This, Plaintiff cannot do.

**1.     Denial of Chronic Care Medication**

Plaintiff asserts that he was denied his chronic care medication (eye drops) between April 3, 2003, and July 3, 2003. Even after he notified medical personnel, he was denied some of his medication again between October 13, 2003, and November 6, 2003. When an inmate is complaining about a delay in treatment (or, in this case, a delay in receiving medication for treatment), the objective "seriousness" of the deprivation must be measured by reference to the *effect* of any delay. Coleman, 114 F.3d at 784 (citing Crowley v. Hedgepeth, 109 F.3d 500, 502 (8th Cir. 1997)). To succeed on his claim, Plaintiff must place verifying medical evidence in the record to establish the detrimental effect of delay in medical treatment, i.e., that Defendants ignored a critical or escalating situation, or that the delay adversely affected his prognosis. Id.; Beyerbach v. Sears, 49 F.3d 1324, 1326-27 (8th Cir. 1995). See also the following unpublished cases of Jackson v. Hallazgo, 30

Fed. Appx. 668 (8th Cir. Mar. 6, 2002) (unpub. per curiam) (citing Coleman, 114 F.3d at 784) ("[a]n inmate's failure to place verifying medical evidence in the record to establish the detrimental effect of delay in medical treatment precludes a claim of deliberate indifference to medical needs"); O'Neal v. White, 221 F.3d 1343 (8th Cir. July 12, 2000) (unpub. per curiam) (citing Crowley, 109 F.3d at 502) (concluding that plaintiff's "failure to submit verifying medical evidence to show a detrimental effect from any delay in tests, surgery, or alternative treatments was fatal to his Eighth Amendment claim").

The extensive evidence submitted by Defendants (see docket entry #100) indicates that Plaintiff was initially evaluated by H. Ginger, an optometrist. His vision was tested and optic pressures and optic nerves, including cup-to-disk ("CD") ratios, were evaluated. Intra ocular blood pressure ("IOP") below 20 is normal, while pressure readings between 20 and 25 are in the elevated-normal range. On October 21, 1999, Dr. Ginger noted that Plaintiff's IOP was 25/25 (25 in the left eye and 25 in the right eye). This pressure is borderline elevated. Dr. Ginger noted that Plaintiff had a CD ratio of .4, which is also normal, particularly for an African-American male. On March 16, 2000, Dr. Ginger noted that Plaintiff's IOP had increased to 26/26, indicating possible glaucoma, a long and slow disease process.

Dr. Anderson, a physician in medical management, has managed glaucoma cases for twenty years. Per Dr. Ginger's recommendation, Dr. Anderson submitted a consult request for Plaintiff to have a visual field exam to determine whether he had lost any peripheral vision. The initial visual field exam indicated severe vision loss, but was also determined to be unreliable. Defendant Simmons first saw Plaintiff on December 7, 2000, started him on glaucoma eye drops, and recommended that the visual field exam be

redone to assure a more reliable result. A second exam was performed January 3, 2001, which showed only borderline loss, with almost normal vision. The testing optometrist, Dr. Brent Hall, surmised that Plaintiff was probably malingering on the first test.

Plaintiff saw Defendant Simmons again on May 3, 2001. His IOP had improved to 19/20. A new restriction was entered on November 29, 2001, which exempted Plaintiff from duties that required perfect peripheral vision without corrective devices. Plaintiff was seen by Dr. Simmons again on January 3, 2002. His IOP was 19/21. Defendant Simmons prescribed a second eye drop to help control the pressure. Even though it was normal, he wanted to try to lower it more. On May 31, 2002, Dr. Hall performed another visual field exam on Plaintiff. The results indicated only a borderline loss with no regression from the previous valid test. Plaintiff had a follow-up exam with Defendant Simmons on July 11, 2002. His IOP was 12/14. He was prescribed new glasses and continued on the same eye drops.

Between March and June 2003 (when his prescription had expired), Plaintiff was seen only once, on May 16, 2003. That day, he was medically evaluated prior to segregation; however, he did not voice any complaints about the denial of his chronic care medication. On July 1, 2003, Plaintiff submitted a sick call request regarding his eyes stating, "Redness burning in eyes. Pressure up in eyes." He was seen in the infirmary the following day. On July 3, 2003, Plaintiff was seen by Defendant Simmons and informed him that he had not been receiving his eye drops. Despite the lack of medication, his IOP was 25/20, which was elevated in the left eye, but still normal. Defendant Simmons renewed the prescription eye drops and ordered new glasses. At Plaintiff's request, Defendant Simmons also recommended, "due to limited side vision, this I/M would be a

hazard to others when using sharp instruments."[2] A new medical restriction was issued on August 21, 2003, restricting Plaintiff from all activities that require peripheral vision.

Plaintiff alleges that he was denied some of his medication again between October 13, 2003, and November 6, 2003. On December 3, 2003, Dr. Hall performed another visual field exam. The results were consistent with the lowest stage of glaucoma, with only a small amount of loss of visual fields (only slightly abnormal). Plaintiff's vision had not changed from his first valid test in January 2001. Defendant Simmons' follow-up exam on December 9, 2003, indicated that Plaintiff's IOP was 20/19, which is normal. Plaintiff did not report to Defendant Simmons that he had missed his glaucoma medication in October or November. In fact, although Plaintiff filed several sick call requests between August and December 2003, none of them raised any complaint related to his eyes or missed medications.

In the face of this evidence, Plaintiff simply contends that he suffered substantial pain and discomfort as a result of being deprived of his eye drops (see docket entry #112) and offers relevant portions of his deposition testimony in support. Specifically, Plaintiff claims he has no peripheral vision at all, that he sees black spots, that his vision becomes blurred, and that he feels pressure in his eyes, swelling, and pain when he does not use his medication. Plaintiff provides no medical evidence in support of these contentions. Plaintiff's testimony further indicates that he received his medication without any interruption whatsoever between his initial diagnosis in 2000 and March 2003. Contrary to Defendants' recitation of the facts, Plaintiff alleges that between May and July 2003 he

---

[2]Defendant Simmons is an outside provider who is unfamiliar with the Arkansas Department of Correction's ("ADC") medical restriction and classification procedures. As an outside provider, Defendant Simmons may make recommendations, but he has no authority to issue ADC/CMS medical restrictions.

was working in the field where dust, pollen, and grass would get into his eyes and that he verbally reminded infirmary personnel, including Defendants Grandy and Green, "day in and day out" during this time period, that the pharmacy had failed to supply him with his eye medication even though he had followed policy and turned in his refill sticker.

Chronic care medications such as glaucoma eye drops should be consistently administered, and Defendants acknowledge that Plaintiff's medication should not have been allowed to expire. That being said, Plaintiff's medical records do not reveal that the lack of drops negatively impacted his glaucoma. And despite Plaintiff's repetitive verbal notification to Defendants Grandy and Green of the situation, at most their failure to intervene quickly to resolve the situation amounts to negligent conduct. It is certainly less than medically professional. However, even though the pharmacy failed to renew Plaintiff's prescription after he followed policy and turned in his refill sticker, he has admitted that he failed to submit any sick call requests or requests for interview addressing the delay until July 1, 2003. Within two days his medication had been refilled. Moreover, Plaintiff did not report to Defendant Simmons that he had missed his glaucoma medication in October or November. In fact, although Plaintiff filed several sick call requests between August and December 2003, none of them raised any complaint related to his eyes or missed medications. Ultimately, if Plaintiff's chronic care medication was interrupted, he should have submitted a sick call request after turning in his refill sticker produced no results. Last, Plaintiff has failed to place any medical evidence in the record at all to establish that the interruptions in his medication had a detrimental effect on his glaucoma, nor does he dispute the medical evidence Defendants have presented. In sum, Defendants did not ignore a critical or escalating situation. To the contrary, once the issue was brought to

Defendant Simmons' attention, the prescriptions were resumed. Furthermore, Plaintiff is unable to demonstrate that he suffered any adverse effect from the pharmacy oversight. Under these circumstances it cannot be said that Defendants were deliberately indifferent to his serious medical needs.

### 2. Tinted Sunglasses

Plaintiff testified that he did not have his tinted lenses from May to August of 2003. According to Defendants (see docket entry #100), Defendant Green received a pair of confiscated glasses some time during the summer of 2003, but staff was unable to verify to whom they belonged. Plaintiff has admitted that Defendant Green told him she did not know whether the glasses were his; however, he claims he was one of only two to five inmates that had been prescribed tinted sunglasses for glaucoma and he was the only inmate complaining about missing glasses from his property. Regardless, Plaintiff signed for his new glasses on August 4, 2003.

The American Academy of Family Physicians, Glaucoma Foundation, and the American Academy of Ophthalmologists make no recommendations for light sensitivity due to glaucoma. The Glaucoma Foundation states that there is no increased danger to the eye from ultraviolet or infrared light due to glaucoma. Similarly, neither dust nor grass have any adverse effect on glaucoma. Individuals with glaucoma can work outside. While they may have some initial sensitivity walking into sunlight, the light does not negatively affect the disease process. And although tinted lenses may have made Plaintiff more comfortable when initially going outside, they are not required to protect his eyes from the glaucoma process. Defendants last contend that Plaintiff suffered no medical injury from the lack of tinted lenses. Whether Defendant Green's lack of effort was less than

honorable in attempting to return the tinted sunglasses to their rightful owner, her actions do not amount to an independent constitutional violation. Moreover, Plaintiff has failed to come forth with any evidence contradicting Defendants' position on light sensitivity and its relation to glaucoma. In fact, he does not even address the issue. In sum, Plaintiff was medically able to work outside without tinted lenses; thus, any period in 2003 when he did not have tinted lenses is irrelevant in relation to his glaucoma condition or his work restrictions/assignments. For these reasons, this claim must fail.

**B.     Defendants James and Evans**

As to Defendants James and Evans, Plaintiff alleges that he was wrongfully placed on field duty against his medical restrictions. In support of their motion for summary judgment, Defendants contend that they have presented indisputable medical evidence that establishes that even if Plaintiff had to work on the hoe squad without tinted lenses and without receiving glaucoma medications, there is no evidence that he (1) was wrongly assigned to field duty; (2) worked beyond his medical restrictions; or (3) was harmed by his working conditions (see docket entries #100, #102).

According to Defendants, prior to 2002, Plaintiff was evaluated by CMS medical personnel and was issued a medical classification. On November 29, 2001, Plaintiff was evaluated again by CMS medical personnel and was issued a medical classification of M-2 with a restriction that he be exempt from all duties that required perfect peripheral vision without corrective devices. He was not restricted from field duty. Prior to November 29, 2001, Plaintiff was assigned to administrative segregation where he was housed in either a one-man or two-man cell for twenty-three hours a day and did not work inside the unit. On July 3, 2002, the Classification Committee determined that Plaintiff could be reassigned

to general population.  On July 10, 2002, Plaintiff was temporarily assigned to work on Hoe Squad #1.  The ADC Classification Committee, not the infirmary, assigned Plaintiff to a job commensurate with this medical restriction.  On September 18, 2002, Plaintiff's work assignment was temporarily changed, this time to the laundry department.  On October 30, 2002, Plaintiff was assigned to attend school in the mornings and to work field utility in the afternoons (see docket entries #100, #102).

On July 3, 2003, Defendant Simmons renewed Plaintiff's prescription eye drops and ordered new glasses.  At Plaintiff's request, he also recommended, "due to limited side vision, this I/M would be a hazard to others when using sharp instruments."  Defendant Simmons, as an outside provider, may make recommendations; however, he has no authority to issue ADC/CMS medical restriction and classification procedures.  According to Defendants, a restriction from using sharp objects was not necessary due to the minimal abnormality in Plaintiff's peripheral vision.  ADC standards for consistency among classification is to utilize a class II under "eye" due to the minimal abnormality in peripheral vision.  Defendants further contend that a review of Plaintiff's physical exam, almost normal visual fields, and medical classification of November 29, 2001, reveals that his medical class was recorded correctly.  A similar medical restriction (MSF-207) was issued on August 21, 2003, restricting Plaintiff from all activities that require peripheral vision (see docket entries #100, #102).

Plaintiff alleges that Defendants James and Evans violated his constitutional rights when they reassigned him from laundry duty in 2002 to outside field utility against his M-2 medical classification.  Plaintiff further alleges that because Defendants were both wardens of the unit and served as members of the Classification Committee, they had the duty and

responsibility to remove him from field duty and to place him in a job assignment inside (see docket entry #114). Plaintiff acknowledges that he has never had any one-on-one conversations with Defendant Evans regarding his classification. The only reason Plaintiff has named him as a party to this lawsuit is because he was aware of Plaintiff's complaint through the grievance procedure and he had the duty to remove Plaintiff from the hoe squad and did not. Plaintiff seeks to hold Defendant James liable on the grounds that as head of classification in November 2002, he took Plaintiff off of his inside job working in the laundry and put him out in the field. According to Plaintiff, he was the sole cause of his pain and suffering. Plaintiff remained on field duty until August 2004, when Defendant Simmons changed his medical restriction and he was taken out of the field (see docket entry #102).

As an initial matter, this Court finds that this particular claim is more properly characterized as deliberate indifference to a known medical condition/restriction rather than a medical care denial claim. As such it is more appropriately analyzed under the standard applicable to Eighth Amendment failure to protect claims. "[T]he treatment a prisoner receives in prison and the conditions under which he is confined are subject to scrutiny under the Eighth Amendment." Helling v. McKinney, 509 U.S. 25, 31 (1993).

To make out his claim, Plaintiff must prove both that Defendants' acts objectively caused a sufficiently serious deprivation and that each Defendant had a subjectively culpable state of mind. Farmer v. Brennan, 511 U.S. 825, 837 (1994) (holding that "a prison official cannot be found liable under the Eighth Amendment for denying an inmate humane conditions of confinement unless the official knows of and disregards an excessive risk to inmate health or safety").

First, the deprivation alleged must be objectively and sufficiently serious. Id. at 834 (quoting Wilson v. Seiter, 501 U.S. 294, 298 (1994)). In other words, Plaintiff must demonstrate that he was "incarcerated under conditions posing a substantial risk of serious harm." Farmer, 511 U.S. at 834. Second, Plaintiff must establish that each Defendant had a "sufficiently culpable state of mind." Id. (internal citations and quotations omitted). "In prison-conditions cases that state of mind is one of 'deliberate indifference' to inmate health or safety." Id. (quoting Wilson, 501 U.S. at 302-303). Estelle v. Gamble[3] established that deliberate indifference consists of something more than mere negligence. Farmer holds that the prison official must know of and disregard an excessive risk to inmate health or safety; "the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." Farmer, 511 U.S. at 837. However, an official's failure to alleviate a risk that he should have perceived, but did not, is not sufficient for a finding of liability. Id. at 838. "Whether a prison official had the requisite knowledge of a substantial risk is a question of fact . . . including inference from circumstantial evidence, . . . and a factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious." Id. at 842; see also Spruce v. Sargent, 149 F.3d 783, 786 (8th Cir. 1998) ("if a plaintiff presents evidence of 'very obvious and blatant circumstances' indicating that the defendant knew the risk existed, the jury may properly infer that the official *must* have known"). Prison officials may avoid liability by proving that they were unaware of any risk to inmate health or safety or that, although aware of the underlying facts indicating a

---

[3] 429 U.S. 97 (1976).

sufficiently substantial danger, they believed that the risk was "insubstantial or nonexistent." Farmer, 511 U.S. at 844. Additionally, "prison officials who actually knew of a substantial risk to inmate health or safety may be found free from liability if they responded reasonably to the risk, even if the harm ultimately was not averted." Id.

Plaintiff must demonstrate that his placement on field duty with his medical restriction was a condition that posed a substantial risk of serious harm. Next, he must demonstrate that Defendants knew of and disregarded the excessive risk to his safety. He can do neither. Plaintiff has alleged that he was wrongfully placed on field duty against his medical restrictions and, when the pharmacy failed to refill his eye drop prescription(s), he suffered substantial pain and discomfort as a result. First, Plaintiff has no constitutional right to a particular job assignment. Nor does his assignment to field duty constitute cruel and unusual punishment per se. See Franklin v. Lockhart, 890 F.2d 96, 97 (8th Cir. 1989). Second, during the relevant time period, Plaintiff's medical restriction exempted him only from duties that required perfect peripheral vision without corrective devices. It did not exempt him from field duty outright. Further, this restriction was not for his protection, but was for protection of those who might be working alongside him. His disagreement with his job assignment is just that, a disagreement. It does not rise to the level of a constitutional violation. Absent any evidence to the contrary, Plaintiff's claim fails.

## IV. Conclusion

In accordance with the above, IT IS, THEREFORE, ORDERED that:

1. Defendants Simmons, Grandy, and Green's motion for summary judgment (docket entry #98) and Defendants James and Evans' motion for summary judgment

(docket entry #101) are GRANTED and Plaintiff's claims against them are dismissed in their entirety with prejudice.

    2.    Any pending motions are DENIED AS MOOT.

    3.    The jury trial set for July 13, 2006, is cancelled.

DATED this  30th  day of June, 2006.

_____
UNITED STATES MAGISTRATE JUDGE